UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 2:18-CR-00087-4-JRG-DHI |
| | ) | |
| MICHAEL JAMES WALTERS | ) | |

## MEMORANDUM OPINION AND ORDER

Michael James Walters ("Defendant" or "Michael")[1] was convicted on September 18, 2018, of Conspiracy to Distribute and Possess with Intent to Distribute 50 Grams or More of Actual Methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). Sentencing is currently scheduled for September 30, 2019. Before the Court is the defendant's objection to the Presentence Investigation Report ("PSR") for failure of the probation officer to adjust his offense level pursuant to USSG § 3B1.2(b) because he claims he was a "minor participant" in the criminal activity.[2] For the reasons which follow, the objection is **OVERRULED**.[3]

Section 3B1.2 of the Sentencing Guidelines authorizes a two-level reduction if the defendant was a "minor participant," which is defined as someone who is "less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." USSG § 3B1.2(b) and cmt. n.5. The defendant must be "substantially less culpable than the average participant in the criminal activity"[4] to qualify for a reduction.

---

[1] The Court would not ordinarily refer to the defendant by his first name but he is referred to this way in this memorandum to differentiate him from his brother, Edward Walters, also a defendant in the case.
[2] The defendant initially objected pursuant to subsections (a) ("minimal participant") and (b) ("minor participant") of USSG § 3B1.2 but has withdrawn his objection under subsection (a).
[3] As a result, the defendant's advisory guidelines range will be 140-175 months of imprisonment.
[4] An amendment to USSG § 3B1.2's commentary became effective November 1, 2015. The amendment (Amendment 794), which sought to resolve a circuit split, left unchanged the text but revised the commentary of § 3B1.2 to clarify that the district court should compare the defendant's culpability to the

USSG § 3B1.2 cmt. n.3(A). Whether a mitigating role adjustment applies is "heavily dependent on the facts of a particular case" and the Sentencing Commission has provided a non-exhaustive list of five factor for sentencing courts to consider: 1) the degree to which the defendant understood the scope and structure of the criminal activity; 2) the degree to which the defendant participated in the planning or organizing the criminal activity; 3) the degree to which the defendant exercised decision-making or influenced the exercise of decision-making authority; 4) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and 5) the degree to which the defendant stood to benefit from the criminal activity. USSG § 3B1.2 cmt. n. 3(C). "The determination whether to apply [§3B1.2] is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case." USSG § 3B1.2 cmt. n.3(C).

"The defendant bears the burden of proving a mitigating role in the offense by a preponderance of the evidence." *United States v. Romero*, 704 F. Appx. 445, 450 (6th Cir. 2017) (citing *United States v. Salgado*, 250 F.3d. 438, 458 (6th Cir. 2001)). The existence of higher-ranking conspirators does not entitle a defendant to a mitigating-role reduction. *United States v. Miller*, 56 F.3d 719, 720 (6th Cir. 1995). The fact that a defendant is less culpable than the leaders of the conspiracy does not establish that he is "substantially less culpable than the average participant" in a multi-participant conspiracy. *See generally*, USSG § 3B1.2.

In his plea agreement, the defendant stipulated the following facts:

---

defendant's co-participants', not the typical offender of the alleged offense. *See* USSG App. C., Amend. 794 at 115–16.

"Through the testimony of numerous witnesses, the United States would demonstrate, beyond a reasonable doubt, that beginning approximately in January of 2017 and continuing to on or about July 10 , 2018, in the Eastern District of Tennessee and elsewhere, the defendant did knowingly, intentionally, and without authority, conspire with at least one other person to distribute and possess with the intent to distribute at least 50 grams but less than 150 grams of actual methamphetamine, a Schedule II controlled substance.

On January 31, 2017, law enforcement officers responded to the defendant's residence in Bristol (1804 Weaver Pike) due to a report of gunfire. Upon arrival, officers made contact with the defendant, who was holding a Rossi, .22 caliber rifle [Rossi, Model S201220BR]. The defendant admitted to being a felon. He also stated that he was still on probation in Virginia, and knew he was not allowed to possess a firearm. His girlfriend admitted to purchasing the rifle for the defendant. Officers seized the rifle and a box of ammunition.

The defendant is the brother of co-defendant Edward Walters. On February 17, 2018, an individual who was cooperating at the time, and is now a co-defendant in the herein conspiracy, Beverly Ann Brooks, was sent to engage in a video recorded conversation at the direction of law enforcement with co-defendant Edward Walters. During the meeting, it was discussed that co-defendant Mullinax had recently called Edward Walters and told him to be careful selling methamphetamine. He told Edward Walters to bury his methamphetamine, get it out of his house and rent a motel room. Mullinax thought co-defendant Amber Hall might be cooperating with law enforcement due to her recent arrest. The defendant pulled up to the motel in a black truck and got into the back seat of Brooks'

vehicle. His brother, co-defendant Edward Walters, was also present in the vehicle. Edward Walters then sold the defendant two eight balls of methamphetamine (approximately 3.5 grams apiece) and a suboxone strip. During the recording, Edward Walters and the defendant discussed drug debts. The defendant said he owed Mullinax money and had a car hauler and a four-wheeler that he could take to Mullinax to help pay off his drug debt to him. The defendant stated that he intended to 'gram out' the methamphetamine obtained from Edward Walters in order to sell and make money.

On March 2, 2018, a search warrant was executed at 370 Watterson Gap Road, in Hawkins County, Tennessee, the residence of Edward Walters. Among those present during the search were co-defendants Edward Walters, Jamie Wilson and the defendant. Co-defendant Jimmy Gray was outside in a vehicle parked at Walters' residence. During the search, officers located approximately 45.6 grams of actual methamphetamine, three suboxone strips, three xanax pills, 15.1 grams of marijuana, 14 diazepam pills and 8 buprenorphine pills. All of these items were located in the bedroom of Edward Walters. Additionally, multiple digital scales, glass pipes, syringes and baggies were located in his bedroom. A loaded Mossberg 12 gauge shotgun was located less than three feet from the methamphetamine in Edward Walters' bedroom. The methamphetamine was in a Crown Royal bag hanging on a wall in Walters' bedroom. Other items of paraphernalia, including more scales and ammunition were found in the main kitchen/living room area of the residence. In another bedroom, where co-defendant Jamie Wilson was staying, officers located a loaded .380 caliber semi-automatic pistol, a loaded S&W 12 gauge shotgun, three glass pipes, a cut straw, and 2.1 grams of methamphetamine.

On March 2, 2018, following the search, the defendant provided a statement to law enforcement after waiving his *Miranda* rights. The defendant told officers that he had arrived at his brother's residence the night before. The defendant said that Edward Walters sold methamphetamine and that his main source of supply was co-defendant Leonard Mullinax. On occasion, Edward Walters received methamphetamine through the mail and was currently awaiting the receipt of at least seven ounces from Mullinax. The defendant stated that Edward Walters sent money through the mail to Mullinax to pay for the methamphetamine. They recently started using the mail to keep from having to drive to South Carolina every time they needed to re-up. The defendant told officers that he met Mullinax through an unindicted co-conspirator, who helped Mullinax package the methamphetamine. The defendant admitted that he had recently obtained four ounces of methamphetamine on 'front' from Mullinax for $3,200.00. Edward Walters paid the debt for the defendant. Additionally, on at least three occasions, the defendant distributed gram quantities of methamphetamine for Edward Walters. Recently, the defendant had been at the residence of Edward Walters and thought someone was going to rob them. As a result, the defendant admitted that he grabbed a shotgun belonging to Edward Walters for protection, since he knew where the firearms were located. The defendant knew that Edward Walters liked guns and often traded methamphetamine for guns. The defendant also explained that Edward Walters had, in fact, been robbed in the recent past by an unindicted co-conspirator. This resulted in Mullinax sending co-defendant Jamie Wilson and another unindicted co-conspirator to Tennessee to watch over Edward Walters. The defendant was also present on two occasions when Edward Walters sold an ounce or more of methamphetamine to a certain customer." [Plea Agreement, Doc. 132, at 2–4].

The defendant agrees and stipulates that he conspired to distribute and is accountable for at least 50 grams but not more than 150 grams of actual methamphetamine, a Schedule II controlled substance." [*Id.* at ¶ 4].

The defendant claims that he had "very limited participation in the overall conspiracy when compared to multiple other participants such as Edward Walters, Mullinax, and others who distributed huge quantities of multiple kilograms of methamphetamine during the year and a half time period" of the conspiracy. [Doc. 448 at 2]. He compares his participation to a number of other participants.

First, he references Ronald Burchfield, who purchased one to two ounces of methamphetamine a week from Edward[5] over an eight-month period from July 2017 through March 2, 2018. Burchfield's largest purchase of methamphetamine from Edward was 20 ounces of methamphetamine. Edward dated a relative of Burchfield, an unindicted co-conspirator ("UIC"), who robbed Edward of methamphetamine and cash. Burchfield then brought the UIC to Edward's residence at Edward's request, and she was assaulted by Jamie Wilson. Burchfield was a user of methamphetamine, using an eight-ball a day at the peak of his addiction. He often served as an intermediary for Edward by selling methamphetamine to people Edward did not want to deal with directly. Burchfield stipulated that he conspired to distribute at least 500 grams but less than 1.5 kilograms of actual methamphetamine. *See generally*, [Doc. 169].

Michael also compares his participation to that of Amber Lynn Hall, who stipulated that between January 2017 and July 10, 2018, she conspired to distribute at least 500 grams but less than 1.5 kilograms of methamphetamine. Hall began purchasing methamphetamine

---

[5] Again, the Court uses a first name to distinguish Edward Walters from his brother, Michael Walters.

from Edward in gram quantities and ending up with ounce purchases once or twice a week. She purchased ounce quantities for eight or nine months from Edward. Hall and her husband, Corey Morelock, who sold methamphetamine together, drove Edward to South Carolina to obtain one-to-two kilograms of methamphetamine from Mullinax on approximately ten occasions. Ordinarily, Edward would give Hall and Morelock two ounces of methamphetamine on front. [Doc. 139 at 4–6].

Michael also compares his participation to that of Jacob Kiersey. Kiersey conspired to distribute at least 500 grams but less than 1.5 kilograms of actual methamphetamine between January 2017 and August 1, 2017. A confidential informant ("CI") made purchases of approximately 3.5 grams of actual methamphetamine from Kiersey on June 15, 2017, approximately 3.7 grams on June 21, 2017, and a half ounce (14 grams) on July 15, 2018. Kiersey's primary source of supply was Edward. He purchased 3.5 grams per week from January to February 2017 and then a half-ounce twice a week from February through April, 2017. From mid-August forward, he obtained an ounce twice a week. Sometime in June, 2017, Kiersey obtained 3 ounces of methamphetamine from Edward, before a falling out because he never paid for the methamphetamine. Between January 2017 and June 2017, Kiersey drove Edward to South Carolina to purchase methamphetamine from Mullinax approximately ten times, picking up an estimated 20-25 ounces each time. [Doc. 170 at ¶ 4].

Michael also refers to the case of Destiny Lashay Lawson who conspired to distribute at least 150 but less than 500 grams of methamphetamine purchased from Edward and a UIC over a period of 18 months between January 2017 and July 10, 2018. Lawson sold one gram of methamphetamine to a CI in May 26, 2016, prior to the beginning of the

7

instant conspiracy. She sold a gram to a CI on November 29, 2017. During a traffic stop on February 8, 2018, with co-conspirator Megan Moore, Lawson was in possession of more than a half ounce of methamphetamine bought from Edward, which was smuggled into the Hawkins County jail by Moore. She admitted to purchasing approximately ten ounces of methamphetamine from Edward and another four ounces from another source of supply. Lawson made a phone call to Edward from the Hawkins County jail on February 13, 2018, to tell him of the traffic stop and "that the police must be watching him and to be careful." [Doc. 147 at ¶ 4].

Michael also compares his participation in the conspiracy to that of Jacob Donald Meyers. Meyers stipulated to conspiring to distribute at least 500 grams but less than 1.5 kilograms of methamphetamine. Meyers was arrested on March 31, 2018, in possession of approximately 11.6 grams of methamphetamine. He advised officers that he had been using methamphetamine for about one year and began purchasing small quantities of methamphetamine from Edward, with the quantity gradually increasing over time, buying two ounces on one occasion. Meyers bought methamphetamine from Edward every ten days or so and also took others to Edward's house to purchase methamphetamine. Meyers sold three-quarters of an ounce out of every two ounces of methamphetamine he got from Edward and sold a quarter ounce every other day for three or four months. He also purchased methamphetamine for co-defendant Burchfield. Meyers drove Edward to South Carolina to purchase 24 two-ounce packages of methamphetamine from Mullinax on one occasion in the latter part of 2017. [Doc. 175 at ¶ 4].

Michael also points to the case of Corey Morelock, Hall's boyfriend. He conspired to distribute at least 500 grams but less than 1.5 kilograms. As noted above, Morelock and

Hall sold methamphetamine together and the facts stipulated to by Hall are generally consistent with those stipulated by Morelock. [Doc. 149 at ¶ 4].

The defendant, through counsel, argues that "the participation of these also 'average' co-defendants and others far exceeded Michael Walters' limited participation of some two months[6] and 120 grams to which he pled the full amount up to 150 grams." [Doc. 448 at 6]. Counsel also argues there is a disparity in treatment between Michael and "other average participants identified by the government." [*Id*.]. As for Michael's alleged "limited" participation, he describes his involvement in the conspiracy as "a period of about 1-3 months at most, that he purchased 7 grams of methamphetamine from his brother on one occasion in February 2018, was at his brother's house when it was searched and methamphetamine was found in his brother's bedroom, sold a gram quantity for his brother on three occasions, and he purchased four ounces of methamphetamine directly from Mullinax on one occasion around February 2018 for an estimated total of 120 grams." [*Id.* at 6–7].

At oral argument on the objection, counsel for the defendant argued that the "average participant was moving at least kilograms," [Hr'g Tr., Doc. ___, at 5], and Michael is "nowhere near that." [*Id.* at 4]. According to the defendant, "you had to average in people like his brother, Edward Walters, Mr. Mullinax, and several other people." [*Id.*]. Michael argues that his biggest purchase was 4 ounces, "a very small amount compared to his brother, obviously, and Mullinax [who] were the leaders." [*Id.* at 5]. The defendant

---

[6] Although the government agreed with the defendant's assertion that he was only involved over about two months, the defendant did stipulate "that beginning approximately in January of 2017 and continuing to on or about July 10, 2018, in the Eastern District of Tennessee and elsewhere, **the defendant did knowingly, intentionally, and without authority, conspire** with at least one other person **to distribute and possess with the intent to distribute** . . . a period considerably longer than two months. [Doc. 132 at ¶ 4].

9

acknowledges that "he knew what was going on," [*id*.], but "he did not live with his brother" and "was "maybe . . . [there] every couple of months to fix something." [*Id.* at 6]. The defendant argues he did not transport Edward to South Carolina and was not a daily participant. [*Id*.].

The government notes that four other co-defendants were convicted and held responsible for lesser quantities than the defendant and his participation makes him "more culpable than . . . about 20% . . . of the people involved in the conspiracy." [*Id*. at 14–15]. The government argues that "Defendant had a very good understanding of the scope and functioning of this conspiracy," [*id.* at 8], that he "knew the . . . ultimate source of supply in this conspiracy," that he "got 4 ounces of methamphetamine, by his own admission, from Mr. Mullinax . . . not having to go through other people to get to the top of the food chain," and" was aware of the dangers in the conspiracy," citing the time when Michael was at Edward's house and "grabb[ed] a shotgun because he thought they were about to get robbed." [*Id*. at 9]. Michael also knew that Jamie Wilson had been sent from South Carolina by Mullinax "to help Edward Walters run this organization," was present at Edward's house when the [March 2, 2018] search warrant was executed," was aware that the mail was used as a means of distributing methamphetamine, and was aware that Edward traded firearms for methamphetamine. [*Id*. at 9–10].

The government also argues that Michael's own known direct participation in the actual distribution of methamphetamine was substantial in that he was personally responsible for distributing at least 50 but less than 150 grams of methamphetamine, a "conservative" amount. [*Id*. at 11; Doc 441 at 5]. The government also cites the defendant's repeated possession of firearms. [Doc. 441 at 5; Revised PSR, Doc. 457, at ¶¶ 10, 14, 22].

As noted above, the burden is on the defendant to prove by a preponderance of the evidence that he is entitled to the mitigating role adjustment. Here, neither the government nor the defendant have offered any proof except for the stipulated facts in the plea agreement and both rely on those facts.

The five factors to be considered by the Court in this "fact-intensive" inquiry are set out above. The government acknowledges that there is no "proof that Michael participated in the planning or organizing of this conspiracy, § 3B1.2, cmt. n. 3(C)(ii), and nothing more than "minimal" proof that he exercised decision-making authority or influenced the exercise of decision-making authority, § 3B1.2, cmt. 3(C)(iii). These factors therefore weigh in the defendant's favor.

It appears to the Court, however, that the other factors all weigh in favor of the government. It is conceded by the defendant that he "understood the scope and structure of the criminal activity, §3B1.2, cmt. n. 3(C)(i). *See* [Hr'g Tr., Doc. ___, at 6 ("He knew what was going on.")]. Even without the defendant's concession, however, the record is replete with evidence of the defendant's understanding of the scope and structure of the conspiracy. As the government argues, he knew the source of the methamphetamine supply (Mullinax) and was able to deal directly with him, [Revised PSR, Doc. 457, at ¶¶12, 14 (taken directly from plea agreement)]; he is the brother of Edward, a leader in the criminal activity; he obtained methamphetamine from his brother and discussed drug debts with his brother, including money Michael owed Mullinax; he was present when the March 2, 2018 search warrant for Edward's residence was executed, along with his brother and Jamie Wilson, who was sent to Tennessee by Mullinax to "watch over Edward Walters"; he had spent the night at Edward's residence the night before the execution of the warrant; he knew that

"Edward Walters received methamphetamine through the mail and was currently awaiting receipt of at least seven ounces from Mullinax"; he knew that Edward sent money through the mail as payment to Mullinax; he knew where firearms were located in Edward's house (belying Michael's argument that he was at Edward's house only every two months to fix things); he knew that Edward had previously been robbed of drugs and money in the past by an unindicted co-conspirator, resulting in Mullinax sending Jamie Wilson to Tennessee; and he knew that he had been present when Edward sold an ounce to a customer on two occasions. [Doc. 457 at ¶¶ 12, 13, 14]. From these undisputed facts, it is clearly apparent the defendant intimately understood the scope and structure of the criminal activity. This factor weighs heavily against Defendant.

The defendant fares no better under the fourth and fifth factors. The "nature and extent of [his] participation in the commission of the criminal activity" also weighs heavily against him. The defendant is held accountable here for an amount of methamphetamine lower than many other participants. That amount, however, is not insignificant; he stipulated he is responsible for distributing at least 50 grams but less than 150 grams of actual methamphetamine. On February 17, 2018, the defendant obtained approximately seven grams of methamphetamine from his brother which "he intended to 'gram out' . . . in order to sell and make money." More significantly, Michael was "fronted" four ounces of methamphetamine by Edward's supplier, Mullinax, for $3,200, which Edward paid. Not only is the quantity significant in itself, Michael was able to deal directly with Mullinax, evidencing a high level of trust between Michael and the supplier of the conspiracy. Not only is there a high level of trust exhibited between Michael and the supplier, there was clearly a high degree of trust between Edward and Michael. Edward not only sold to

Michael, he openly conducted significant drug trafficking activities in the presence of Michael and trusted Michael to deliver drugs for him. Michael knew of the location of firearms in Edward's house, one of which was, on the date of March 2, 2018, located within three feet of a substantial quantity of methamphetamine in Edward's bedroom, Furthermore, on one occasion, Michael had been present at Edward's residence when he grabbed a shotgun owned by Edward "for protection" when he "thought someone was going to rob *them*," the use of the personal pronoun strongly suggesting a joint proprietary interest in the objects of the robbery. All of this together, coupled with Michael's intimate understanding of the scope and structure of the conspiracy establishes that it is more likely than not that Michael was involved at the highest levels of this conspiracy, regardless of the specific quantity attributed to him for purposes of determining his base offense level under the Guidelines.

Not only does it appear that the defendant had a vested interest in the criminal activity, he clearly also "stood to benefit from the criminal activity." As noted above, the defendant admits he intended to "gram out" (*i.e.*, sell in gram quantities) the methamphetamine he received from Edward to make money and the four ounces he obtained from Mullinax was clearly a quantity destined for further distribution, likely also in gram quantities (approximately 112 grams).

In short, three of the five application note 3(C)'s factors weigh heavily against the defendant, while two weigh in his favor. It is not as simple, however, as saying the defendant loses 3-2. The determination is made based on the "totality of the circumstances." In the Court's view, the defendant has failed to meet his burden of establishing by a preponderance of the evidence, that he is "substantially less culpable than the average

participant" in this conspiracy. While he may be less culpable than some of the participants, including the leaders, he is not *substantially* less culpable than the average participant,[7] and the objection is therefore **OVERRULED**. The advisory guidelines range calculated in the PSR, 140-175 months of imprisonment, will therefore be adopted by the Court for consideration along with all the other 18 U.S.C. § 3553(a) factors.

So ordered.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE

---

[7] The commentary refers, of course, to the "average participant." At oral argument on the objection, the Court asked the parties to identify the average participants in the conspiracy. Both parties struggled to do so. In light of the Court's findings, it is unnecessary for the Court to precisely define the "average participant.'' That person is clearly not among those at the top or the bottom of the heap. The defendant focused his argument on the quantity of drugs attributable personally to each party, arguing that the "average participant" trafficked in kilogram quantities of methamphetamine, seeming to take the quantities attributable to all participants and dividing by the number of participants to arrive at the average. Such an approach is flawed, however, in that quantity is not necessarily a proxy for each participant's level of participation. It is simply one factor among the totality of the circumstances.